UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| IGF INSURANCE COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY, an Illinois Insurance | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant, | ) | 1:01-cv-799-RLY-KPF |
| _____ | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY, and 1911 CORP., | ) | |
| | ) | |
| Counterplaintiffs and | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| IGF INSURANCE COMPANY, IGF | ) | |
| HOLDINGS, INC., and SYMONS | ) | |
| INTERNATIONAL GROUP, INC. | ) | |
| | ) | |
| Counterdefendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GORAN CAPITAL, INC., GRANITE | ) | |
| REINSURANCE COMPANY, LTD., | ) | |
| SUPERIOR INSURANCE COMPANY, | ) | |
| PAFCO GENERAL INSURANCE | ) | |
| COMPANY, ALAN SYMONS, DOUGLAS | ) | |
| SYMONS, and G. GORDON SYMONS, | ) | |
| | ) | |
| Counterdefendants and | ) | |
| Third-Party Defendants. | ) | |

1

# ENTRY ON THE INDIVIDUAL AND CORPORATE DEFENDANTS' OBJECTION TO THE TESTIMONY OF DESIGNATED EXPERT DAVID BORGHESI

On October 10, 2008, Counterdefendant Symons International Group, Inc. ("SIG") and Third-Party Defendants Goran Capital, Inc. ("Goran") and Granite Reinsurance Company, Ltd. ("Granite Re"), and Third-Party Defendants Alan Symons and G. Gordon Symons (the "Individual Counterdefendants") (collectively the "Counterdefendants"), filed an objection to the testimony of David A. Borghesi ("Mr. Borghesi"), the proposed expert witness of Counterplaintiffs, Continental Casualty Company and 1911 Corp. (collectively "CCC").  Mr. Borghesi was employed by CCC to give an opinion on the value of certain agreements between Acceptance Insurance Companies, Inc. ("Acceptance") and Goran, Granite Re, and SIG. He was also employed to critique the valuation opinion of the Counterdefendants' proposed expert, Dominic Weber ("Mr. Weber").  On November 13, 2008, the court took the motion under advisement, and allowed Mr. Borghesi to testify during the court trial of this matter on January 8, 2009. For the reasons explained below, the court finds that Mr. Borghesi's testimony is admissible under *Daubert*.  Accordingly, the Counterdefendants' Objection to the Testimony of Designated Expert David Borghesi is **OVERRULED**.

## I.      Standards Governing Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Civil Procedure and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  Federal Rule of Evidence 702 ("Rule 702"),

2

provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The Supreme Court in *Daubert* interpreted this rule to require that expert testimony be both relevant and reliable. *Daubert*, 509 U.S. at 589; *see also Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). In the present case, the Counterdefendants principally challenge the reliability of Mr. Borghesi's proposed expert testimony. "The district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000).

The reliability prong requires the court to initially determine whether the expert is qualified in the relevant field. *Smith*, 215 F.3d at 718. Rule 702 specifically provides that an expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702; *see also Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."). "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718.

The reliability prong also requires the court to examine the expert's methodology. *Id.* The purpose behind this requirement is to ensure that the expert's opinion is based upon a valid scientific method or otherwise based upon sufficient facts or data. *Id.* (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999) ("Even 'a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'")). Challenges to the "factual underpinnings" of an expert's analysis or the conclusions based on that analysis are not appropriate challenges to an expert's methodology; rather, such factual matters are to be determined by the trier of fact. *Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *Walker*, 208 F.3d at 587 (in addressing whether an expert's opinion is reliable, a district court should consider whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed").

**II.     Discussion**

Mr. Borghesi is a Certified Public Accountant and consultant. (Expert Report of David A. Borghesi ("Borghesi Report") at 2). One of Mr. Borghesi's "areas of specialization is analyzing accounting transactions and computing economic damages in connection with civil litigation and contractual matters." *Id.* From 1970 to 2002,

Borghesi worked at Arthur Anderson LLP, during which time he was employed as an auditor and forensic accountant. (Borghesi Report at 2; *see also* Borghesi Tr.[1] at 815-16). Borghesi is currently employed as Managing Director in the Financial and Economic Consulting practice of Huron Consulting Group LLC. (Borghesi Report 2; Borghesi Tr. at 817).

> Mr. Borghesi was employed by CCC to give his opinion on:
>
> (1) whether certain payments made by Acceptance to Goran and SIG for consulting and non-competition agreements were made based on fair market value of such agreements or rather, constituted consideration for the purchase price of the crop insurance business; and (2) whether any portion of the payments made by Acceptance to Granite Re for an indemnification as part of a five-year reinsurance program were based on the fair market value of such indemnities or rather, constituted consideration for the purchase price of the crop insurance business.

(Borghesi Report at 4).

After a review of the relevant documents in this matter, Mr. Borghesi came to the following conclusions:

> A. Payments of $4,500,000 each to Goran and SIG are substantially purchase price consideration and such consideration should have been paid to IGF Insurance Company.
>
> B. Payments of $6,000,000 and future payments of $9,000,000 to Granite Re appear to be substantially purchase price consideration that should have been paid directly to IGF, and the portion of the payments, if any, related to the indemnification provision should be valued at fair market value of alternative coverage then available.

(*Id.* at 5). Stated differently, Mr. Borghesi determined that the payments by Acceptance

---

[1] Citations to "Borghesi Tr." are from his testimony at trial.

5

for the noncompete and consulting agreements and for the indemnity provision contained in the reinsurance treaty do not reflect the fair market value of such agreements. Indeed, Mr. Borghesi found these agreements to be practically worthless. (*See, e.g.,* Borghesi Tr. at 864, 894).

The Counterdefendants challenge Mr. Borghesi's opinion on the following grounds: (1) Mr. Borghesi is not qualified to offer an opinion on whether the agreements were worth the amount Goran, SIG and Granite Re received for them; (2) Mr. Borghesi employed no cognizable methodology in valuing the agreements; and (3) Mr. Borghesi's opinions are speculative. The court will address these objections in turn below.

### A. Mr. Borghesi Is Qualified to Render An Opinion on Valuation

First, the Counterdefendants maintain that Mr. Borghesi's experience does not qualify him to render opinions regarding the agreements at issue or to critique the valuation of IGF's crop insurance business prepared by the Counterdefendants' expert, Mr. Weber. The court does not agree. The court finds Mr. Borghesi's extensive experience as an auditor and forensic accountant qualifies him to opine on whether payments to Goran, SIG, and Granite Re by Acceptance for non-compete and consulting agreements and an indemnity provision reflected the true economic substance of such transactions. The fact the he lacks experience valuing the specific type of agreements at issue and has never valued a book of insurance business, (*see* Borghesi Tr. at 907), does not render his opinion inadmissible; rather, such an objection goes to the weight and credibility of his testimony. *Suter v. Gen. Acc. Ins. Co. of Am.*, 424 F.Supp.2d 781, 794-

6

95 (quoting *Kannankeril v.Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) ("'If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility.'")).  Accordingly, the Counterdefendants' objection regarding Mr. Borghesi's qualifications is overruled.

    **B.**    **Mr. Borghesi's Testimony is Reliable**

        **1.**    **Mr. Borghesi's Use of the With-And-Without Methodology Was Reliable and Appropriate**

Mr. Borghesi utilized a "with-and-without" methodology in determining whether the non-compete and consulting agreements and the indemnity provision were worth the $24 million Acceptance paid for them. The "with-and-without" methodology compares the economic value to Acceptance with the agreements versus the economic value to Acceptance without the agreements.  In other words, to the extent the economic benefit to Acceptance of the IGF transaction was no different with the agreements than without, Mr. Borghesi could conclude – as he did – that the agreements were not worth the $24 million Acceptance paid for them.

The Counterdefendants challenge the validity of Mr. Borghesi's methodology by arguing that:

> [o]ne would assume that, in determining whether the agreements were worth what Acceptance paid, Borghesi would conduct an independent determination of the agreements' fair market value and compare his figures with the payments made by Acceptance.  Borghesi appears to agree this is the proper way to determine whether Acceptance overpaid . . . [but], he does not attempt such an evaluation himself.

(Counterdefendants' Brief at 8).  Mr. Borghesi explained in his deposition that he did not

7

need to calculate the precise value of the non-compete and consulting agreements because, based upon the facts and circumstances presented by this case, the value was *de minimis*. (*See* Borghesi Dep. at 40 ("I think in the circumstances and the information that I was given, that any . . . objection valuation . . . would still lead you to a *de minimis* number, because of the circumstances and the data that was [sic] available to me.")); *see also* Borghesi Tr. at 902 ("Again, I have testified more than once here that I did not do a specific dollar calculation because it was obvious to me based upon the facts and circumstances and the attributes that I looked at that the economic benefit to Acceptance without the noncompete was not substantially different than the economic benefit to Acceptance with the noncompetes."). Thus, "there was really no need to make that computation." (Borghesi Tr. at 901). Mr. Borghesi's explanation is based upon his skill and experience as a CPA. Mr. Borghesi has employed this methodology on prior occasions to value other business entities, (*see, e.g.*, Borghesi Tr. at 827-28), as have other business valuation experts in other courts of law. *See Local Oklahoma Bank, N.A. v. United States*, 59 Fed. Cl. 713, 717 (Fed. Cl. Ct. 2004) (approving accounting expert's use of "with and without" methodology to calculate bank's tax liability); *Thompson v. Commr. of Internal Revenue*, T.C. Memo. 1997-287, at *10 (U.S. Tax Ct. 1997) (finding expert report helpful, logical, and clear where it used a with-and-without methodology for valuing a noncompete agreement). Given the evidence of record, the court finds that Mr. Borghesi's with-and-without methodology is sound and appropriate under the facts and circumstances of this case. Accordingly, the Counterdefendants' objection is overruled.

The Counterdefendants also attack the four factor test that Mr. Borghesi used to evaluate the non-compete agreements. The four factors relied upon by Mr. Borghesi include "specialized business knowledge, industry expertise, customer/agent relationships, and abilities (financial and intentions to compete.)." (Borghesi Report at 6). Mr. Borghesi testified in his deposition, taken before trial, that "these are the types of issues that are frequently referred to when you look at noncompete agreements." (Borghesi Dep. at 45). However, he was unable to identify a specific publication setting forth these factors. (*Id*. at 44-45). The Counterdefendants argue that Mr. Borghesi's inability to name the source of these factors renders his methodology "ad hoc" and unreliable. (Counterdefendants' Brief at 9).

At trial, Mr. Borghesi explained that the authoritative literature available on the relative value of non-competes is "pretty sparce" because "valuing noncompetes is not a huge practice that is done frequently like general damage analysis would be." (Borghesi Tr. at 846). He went on to explain that the information his accounting firm found consisted of "internal documents from another accounting firm, some just what I'll call promotional articles written by some people who deal with valuations, [and] a 1990 treatise on noncompetes from the AICPA." (*Id*.). Because valuing non-competes is a fact-sensitive inquiry, "at the end of the day you have to apply your own judgment to a specific case." (*Id*.). Thus, Mr. Borghesi determined that based upon his "business experience over 30 years," the facts and circumstances of this case, as well as the available literature on non-compete valuation, the four factors he utilized fit this case.

9

(*Id.* at 846, 912-13).  Based upon that testimony, the court finds Mr. Borghesi utilized materials frequently relied upon by experts in his field.  The Counterdefendants' objection with respect to the actual source of the materials Mr. Borghesi relied upon goes to the weight and credibility of his testimony, not its admissibility.  Accordingly, the court finds that Mr. Borghesi's methodology meets the *Daubert* reliability standard, and thus, the Counterdefendants' objection is overruled.

### 2. The Counterdefendants' Reliance on the Wyndam Decision Is Misplaced

In *Wyndam Int'l, Inc. v. Ace Am. Ins. Co.*, 186 S.W.3d 682 (Tex. Ct. App. 2006), the Texas Court of Appeals upheld the trial court's order finding Mr. Borghesi's expert testimony inadmissible.  The Counterdefendants argue that the decision is a "relevant fact the Court should consider in deciding whether to admit his testimony" and reflects "persistent flaws" in Mr. Borghesi's methodology which are "endemic to his consulting practice."  (Counterdefendants' Brief at 7).

In *Wyndam*, the hotel owner brought suit against the property insurers and broker to recover business income lost from the September 11, 2001, terrorist attacks.  *Id*. at 684.  The insurance companies moved for the exclusion of Mr. Borghesi's damages calculation as unreliable and irrelevant, and, after an evidentiary hearing, the trial court excluded his testimony.  *Id*.  The Texas Court of Appeals affirmed the trial court decision excluding Mr. Borghesi's testimony as "irrelevant" because it was "not based upon a reliable foundation."  *Id*. at 689.  The objectionable foundation cited by the Texas Court of

Appeals was not, however, related to Mr. Borghesi's methodology, nor his qualifications to render an expert opinion, but rather the unreliable data provided to Mr. Borghesi by the party that retained him, i.e., Wyndam. *Id.* at 687-89; (*see also* Borghesi Tr. at 831-32).

There is no challenge to the underlying data provided by CCC for purposes of this case. The data originally comes from the non-compete agreements and indemnity provision – documents provided to CCC from the Counterdefendants themselves. The reasons for the exclusion of Mr. Borghesi's opinion in *Wyndam* are not present in this case, and thus, the *Wyndam* decision is not relevant for purposes of this motion. Accordingly, the Counterdefendants' challenge to his testimony based on the *Wyndam* decision is overruled.

## C. Mr. Borghesi's Opinions Are Not Speculative

Lastly, the Counterdefendants argue that Mr. Borghesi's opinions with regard to the value of the non-compete agreements and indemnity provision are speculative, would not assist the trier of fact, and are therefore inadmissible. The court will begin its discussion with Mr. Borghesi's opinions regarding the non-compete agreements.

### 1. Mr. Borghesi's Opinion Regarding the Non-Competes Is Not Speculative

In his report, Mr. Borghesi opines that "a substantial portion of the moneys paid directly to Goran and SIG, ostensibly for non-competition and consulting agreements, do not reflect the true economic substance of such payments." (Borghesi Report at 6). The Counterdefendants assert that during Mr. Borghesi's deposition, he "offer[ed] no less than

11

*eight* variations of what constitutes a 'substantial' portion of what Acceptance paid." (Counterdefendants' Brief at 14). Such waffling "suggests that [Mr.] Borghesi is merely speculating as to whether Acceptance overpaid [for the non-compete agreements]." (*Id*. at 15).

Excerpts from Mr. Borghesi's deposition provide helpful insight with respect to this issue:

> Q: . . . Did you quantify what substantial portion was?
>
> A: From the standpoint of substantial, I think I was trying to be maybe on the conservative side, recognizing that a buyer may have some view as towards a noncompetition or consulting agreement, but felt, and still believe that, again, the far greater majority, if not all of the payments, to both Goran and SIG are really for purchase price consideration of the business, and not related to any benefit from a noncompete or a consulting agreement.
>
> Q: . . . Did you quantify it? Did you quantify what the substantial portion was?
>
> A: No. But if I were to quantify, I would say right now that I would say that all of it, unless I have some other additional information that I don't know of today –
>
> Q: Okay.
>
> A: – would be related to purchase price.
>
> Q: All right. So today you would say all of it, correct?
>
> A: That would be my position, yes.
>
> Q: When you did your report, you said a substantial portion of it. Would you agree the two are not equal?
>
> A: True.

12

> Q: All right. Are you saying that you would change your report to say all of it today?
>
> (Pause)
>
> A: Yes, I would.
>
> Q: . . . Okay. Why has it changed?
>
> A: I don't think in substance it really has changed.
>
> Q: Could you explain how you state it hasn't changed or in substance it hasn't changed?
>
> (Objections omitted).
>
> A: I think I previously referred to the fact that any fair market value of those agreements were de minimis. And, therefore, when I say substantial, I mean, very much substantial from the standpoint that almost all, if not all of the payments that were made are purchase price consideration.

(Borghesi Dep. at 32-36). The court finds, based upon the testimony cited above, that Mr. Borghesi's answers are not inconsistent. Mr. Borghesi testified that he believed that the non-compete agreements lack value; whereas, in his expert report, he found their value to be *de minimis*. Under either scenario, his opinion is the same: Acceptance's payments to Goran and SIG for the non-compete agreements was "substantially" purchase price consideration. Again, the Counterdefendants' objections goes to the weight of Mr. Borghesi's testimony, not its admissibility.

The Counterdefendants also argue that "because Borghesi did not calculate the fair market value of the noncompetes," he "has no objective basis by which to judge the price Acceptance paid." (Counterdefendants' Brief at 15). The fact that Mr. Borghesi did not

13

calculate a specific value does not mean that he cannot opine that the price paid by Acceptance was far too high. As noted below, Mr. Borghesi considered the circumstances surrounding the agreements and undertook an analysis of the economic benefit to Acceptance with the noncompetes and without the noncompetes. (Borghesi Report at 6-7). These include:

- The two companies which received the payments for the noncompete agreements – SIG and Goran – were non-operating holding companies not directly in the crop insurance business;

- After the sale of IGF to Acceptance, the IGF employees most knowledgeable about crop insurance were hired by Acceptance and did not continue working with SIG and Goran, which received the non-compete agreements;

- The individuals hired by Acceptance were paid noncompete and retention bonuses that totaled approximately $1.4 million over two years;

- Mr. Borghesi assumed that the payments pursuant to the noncompete and retention bonuses "represent the fair market value as neither the company nor the employees were under duress to make or accept such an offer";

- By contrast, the Individual Counterdefendants received $1 consideration for the noncompetes;

- To the extent that payments were made to either Goran or SIG due to the fact that the Individual Counterdefendants held officer or director positions

> with those entities, the Individual Counterdefendants had a fiduciary duty to IGF such that any assignment of their noncompete agreements should go to IGF before any other entity;
>
> - The Counterdefendants never prepared a valuation or calculation to support the payment of $9 million to Goran and SIG – either at the time of the 2001 sale or at any time since then.

Thus, Mr. Borghesi's opinion that the true economic value of the agreements was *de minimis* is not speculative. Rather, Mr. Borghesi's opinion was based upon a review of the relevant facts and circumstances surrounding the agreements, gleaned from his knowledge and experience as an accountant. Accordingly, the Counterdefendants' objection is overruled.

### 2. Mr. Borghesi's Valuation of the Indemnity Provision Is Not Speculative

During Mr. Borghesi's deposition, he testified that the market value of the indemnity provision was "[p]robably a single premium in the hundreds of thousands of dollars as opposed to millions of dollars." (Borghesi Dep. at 82). The Counterdefendants contend that Mr. Borghesi's "methodology" – consisting of a short conversation with an unknown insurance broker – "is so lacking in reliability and trustworthiness" that it must be stricken. (Counterdefendants' Brief at 15).

Mr. Borghesi did not attempt to calculate a specific value of the indemnity provision, but rather concluded that "the portion of the payments, if any, related to the

15

indemnification provision should be valued at fair market value of alternative coverage then available." (Borghesi Report at 9; *see also* Borghesi Dep. at 80) ("It should be priced at what you could get alternative – the same alternative coverage of $9 million on reps and warranties that you could purchase through a third party insurance company."). Mr. Borghesi arrived at that opinion after speaking to an insurance broker during a break in an arbitration proceeding in which he served as arbitrator. (Borghesi Dep. at 82-83; Borghesi Tr. at 873-75). Due to confidentiality concerns, Mr. Borghesi asked her whether such coverage was generally available in the marketplace. (Borghesi Dep. at 83; Borghesi Tr. at 874-75). The broker informed Mr. Borghesi that coverage in the "9 to $10 million dollar range" could be "placed with Lloyds [of London]" and would cost "in the range of 2 to $300,000." (Borghesi Dep. at 83; Borghesi Tr. at 875). Based upon this information, Mr. Borghesi concluded that if Acceptance required the indemnity provision, it could have been obtained in the marketplace for substantially less than the $15 million consideration in the contract. (Borghesi Report at 10; Borghesi Tr. at 875) (Mr. Borghesi took away from his conversation with the insurance broker that the market value of the indemnity provision at issue is "nowhere near $15 million related to $9 million in coverage.").

Notably, Mr. Borghesi did not use the insurance broker's premium quote as a basis for determining a specific value of the indemnity provision. Rather, after speaking to her and determining that coverage was available to Acceptance at a price substantially less than what Acceptance agreed to pay, Mr. Borghesi based his conclusion on the

assumption that it was available in the open market.  Mr. Borghesi's reliance on the insurance broker in determining whether alternative coverage was available for a cheaper price at the time the Reinsurance Agreement was executed is permissible under Rule 703 of the Federal Rules of Evidence, and was entirely reasonable given the scope of his engagement.  Accordingly, the Counterdefendants' objection to Mr. Borghesi's valuation of the indemnity provision is overruled.

### III. Conclusion

Mr. Borghesi's expert opinion meets the relevancy and reliability standards of *Daubert*.  The Individual and Corporate Defendants' Objection to the Testimony of Designated Expert David Borghesi (Docket # 168) is **OVERRULED**.


**SO ORDERED** this 19th day of October 2009.

>  
> _____  
> RICHARD L. YOUNG, JUDGE  
> United States District Court  
> Southern District of Indiana

Electronic Copies to:

Robert M. Baker III
rbaker@rbakerlaw.net

Robert L. Browning
SCOPELITIS GARVIN LIGHT & HANSON
rbrowning@scopelitis.com

Braden Kenneth Core
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
bcore@scopelitis.com

James H. Hanson
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
jhanson@scopelitis.com

James A. Hardgrove
SIDLEY AUSTIN BROWN & WOOD LLP
jhardgrove@sidley.com

Jeffrey Lynn McKean
WOODEN & MCLAUGHLIN LLP
drichards@woodmaclaw.com

Robert L. McLaughlin
WOODEN & MCLAUGHLIN LLP
rmclaughlin@woodmaclaw.com

Patricia M. Petrowski
SIDLEY AUSTIN LLP
ppetrowski@sidley.com

Michael Rabinowitch
WOODEN & MCLAUGHLIN LLP
mrabinowitch@woodmclaw.com

Ellen S. Robbins
SIDLEY AUSTIN LLP
erobbins@sidley.com

R. Jay Taylor Jr.
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
jtaylor@scopelitis.com

Copy to:

Susan Spies Roth
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603