UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IGF INSURANCE COMPANY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| CONTINENTAL CASUALTY ) | |
| COMPANY, an Illinois Insurance ) | |
| Corporation, ) | |
| ) | |
| Defendant, ) | 1:01-cv-799-RLY-MJD |
| _____) | |
| CONTINENTAL CASUALTY ) | |
| COMPANY, and 1911 CORP., ) | |
| ) | |
| Counterplaintiffs and ) | |
| Third-Party Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| IGF INSURANCE COMPANY, IGF ) | |
| HOLDINGS, INC., and SYMONS ) | |
| INTERNATIONAL GROUP, INC., ) | |
| ) | |
| Counterdefendants, ) | |
| ) | |
| and ) | |
| ) | |
| GORAN CAPITAL, INC., GRANITE ) | |
| REINSURANCE COMPANY, LTD., ) | |
| SUPERIOR INSURANCE COMPANY, ) | |
| PAFCO GENERAL INSURANCE ) | |
| COMPANY, ALAN SYMONS, DOUGLAS ) | |
| SYMONS, and G. GORDON SYMONS, ) | |
| ) | |
| Counterdefendants and ) | |
| Third-Party Defendants. ) | |

**ENTRY ON ALAN AND GORDON SYMONS' MOTION TO AMEND FINDINGS AND CONCLUSIONS AND TO ENTER JUDGMENT IN THEIR FAVOR**

This case centers around the sale of Continental Causalty Company's ("CCC") crop insurance book of business to IGF Insurance Company ("IGF"), and IGF's subsequent sale of that business to Acceptance Insurance Companies, Inc. ("Acceptance"). CCC alleged that $24,000,000 of the $40,500,000 Acceptance paid to purchase IGF was illegally diverted from IGF to IGF's affiliates, the Corporate Counterdefendants (including Symons International Group, Inc. ("SIG"), Goran Capital, Inc. ("Goran"), and Granite Reinsurance, Ltd. ("Granite Re")), and to Alan and Gordon Symons (collectively the "Symons") individually, leaving IGF unable to pay its significant debt to CCC.

On October 19, 2009, the court issued its Findings of Fact and Conclusions of Law, and Judgment following a lengthy bench trial. (*See* Docket ## 257, 258). The court found and concluded that the Symons, as officers and directors of the Corporate Counterdefendants, personally participated in the fraudulent transfer of $24,000,000 to the Corporate Counterdefendants in the form of non-compete agreements with SIG and Goran worth $9,000,000 and a reinsurance agreement worth $15,000,000. The court further found that the Symons personally benefitted from the transfer. In addition, the court found that both the Corporate Counterdefendants and the Symons were alter egos of one another, and pierced the corporate veil to find the Corporate Counterdefendants and the Symons jointly and severally liable for the debt owed to CCC. The document was

140 pages in length, and consisted of 315 Findings of Fact and 128 Conclusions of Law (not counting the summary of conclusions), with appropriate citations to the record. The court simultaneously issued a Judgment, which the Seventh Circuit Court of Appeals later determined was not "final" because it failed to include, among other things, certain parties who were in bankruptcy proceedings, landing the case back in this court.

Two and-a-half years after the court's issuance of its lengthy ruling, in an unusual turn of events, Alan and Gordon Symons (collectively the "Symons") filed the present motion to amend the court's Findings of Fact and Conclusions of Law and ask the court to enter judgment in their favor. The court held a hearing on this matter on March 9, 2012. Having read and reviewed the parties' submissions, the court's Findings of Fact and Conclusions of Law, the designated evidence, and the applicable law, the court **GRANTS** in part, and **DENIES** in part, the Symons' Motion.

A motion to amend the court's findings and conclusions is subject to the general rule regarding the motions to reconsider. As such, "Rule 52(b) is not intended to allow the parties to relitigate old issues, to advance new theories, or to rehear the merits of a case; instead, the recognized grounds for such a motion include manifest error of fact or law by the trial court, newly discovered evidence, or a change in the law." *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 158 F.Supp.2d 906, 908 (E.D. Wis. 2000). The court will begin its discussion with the Symons' objections to the court's Findings of Fact.

### A. Objections to the Court's Findings of Fact

Of the court's 315 Findings of Fact, the Symons object to 48. (*See* Docket # 357). Of those 48, the Symons' principle objections center around two of the court's findings: (1) that Michael McCarthy ("McCarthy"), Chairman of Acceptance, "was not interested in the non-competes," *see* Finding of Fact # 53, and (2) that Alan Symons misrepresented certain facts surrounding IGF's sale to Acceptance to the Indiana Department of Insurance, *see* Finding of Fact # 139. The court will begin with Finding of Fact # 53, which reads:

> 53. Acceptance's Chairman, Michael McCarthy ("McCarthy"), testified that he was not interested in the non-competes and reinsurance agreement; rather, the $40 million purchase price was intended to be for IGF's crop insurance business. (McCarthy Dep. at 10-11 ("I initiated a conversation with Alan about acquiring the crop assets of IGF . . . [W]e had heard that IGF might be for sale, and I called him and asked him."); *id*. at 13 ("I'm not sure I had a clear understanding of who Alan Symons represented. Obviously – maybe it's not obvious – our interest was in acquiring the assets of IGF, its crop division."); *id*. at 15 ("Q: Do you recall what assets you said you were willing to acquire? A: We were interested in the IGF assets employed in the service of crop insurance customers.")). In fact, none of the payments to Goran, SIG or Granite Re were contained in the original proposal made by Acceptance. (TX 29; *see also* McCarthy Dep. at 38-44).

The court's finding should not have been phrased to leave the impression that McCarthy was not interested in non-compete agreements; instead the evidence reflects that while McCarthy was interested in non-compete agreements, he was initially interested in non-compete agreements with "three senior managers and 15 others to be selected by [Acceptance]" who had knowledge of the insurance business. (*See* TX 29). As the court

correctly found, non-compete agreements with SIG and Goran were not contained in McCarthy's initial proposal; instead, they were proposed by Alan Symons in his January 9, 2001, counteroffer. (TX 31; *see also* Deposition of Michael McCarthy ("McCarthy Dep.") at 52 (testifying that the idea for non-compete agreements with SIG and Goran "more likely" originated with Alan Symons)).

The Symons make much of the fact that McCarthy eventually agreed to include in the Acceptance transaction non-compete agreements with SIG and Goran, citing his testimony that he "wanted to make sure that nobody with the ability to compete would compete." (McCarthy Dep. at 58; *see also id*. at 123-24 (testifying that Acceptance's "concern was that the other entities might have better access to capital, so more of a threat.")). McCarthy's testimony, however, is not credible on this point. As opined by CCC's accounting and valuation expert, David Borghesi, neither SIG nor Goran were a competitive threat to Acceptance, because they were (and apparently still are) holding companies; they were not involved in the crop insurance business and did not employ individuals with knowledge of the crop insurance business. (*See* Findings of Fact ## 69-70; *see also id.* ## 56-57). Indeed, McCarthy testified that the decision to pay $9,000,000 for those agreements was made at the close of the deal. (McCarthy Dep. at 106). Moreover, he admitted that no valuation was ever done to determine whether the non-compete agreements were actually worth $9,000,000. (*Id*. at 51; Finding of Fact # 59). Thus, the $4,500,000 payment to SIG and the $4,500,000 payment to Goran were not made to prevent SIG and Goran from competing with Acceptance for crop insurance

business; instead, the payment was, in substance, purchase price consideration that should have been paid to IGF. (*Id*. # 71). Accordingly, the court amends Finding of Fact # 53 to read:

> 53. The original proposal from Acceptance's Chairman, Michael McCarthy ("McCarthy"), included "$6.0 million in non-compete payments paid over three years" to "three senior managers and 15 others to be selected by [Acceptance]." (TX 29). None of the non-compete payments to Goran and SIG, nor reinsurance payments to Granite Re, were contained in that original proposal. (*Id*.; *see also* McCarthy Dep. at 38-44; Trial Testimony of Alan Symons, Docket # 239 at 528-29 (testifying that McCarthy's original proposal did not include non-compete agreements with SIG and Goran and reinsurance from Granite Re)). The idea for non-compete agreements with SIG and Goran, and a reinsurance agreement with Granite Re, came from Alan Symons. (TX 31; *see also* McCarthy Dep. at 52).

Finding of Fact # 139 is broken up into five sub-parts designated (a)-(e), and reads:

> 139. Later that same day, Alan Symons responded to the IDOI's letter. (TX 1622). The letter contains the following misstatements (which are noted in brackets below):
>
> (a) "Symons International Group, Inc. it's [sic] subsidiary IGF Holdings and Goran Capital Inc. had all of the employees, intellectual knowledge and the relationship dealing with the business. This also included the relationships with reinsurers, the independent brokers and the Federal Government." [The employees subject to the non-compete agreements were employees of IGFH, although they performed job duties solely for IGF. (A. Symons Dep. at 393-94; TX 1533). In addition, there is no evidence that SIG or Goran had any "intellectual property" of any kind. All of the "relationships" were maintained by IGF employees. (*See, e.g.*, Gowdy Dep. at 13-15)].
>
> (b) "In order to determine a fair value we looked to an outside investment house to give us the comparable value for the business . . . . Total value to IGF is $28,000,000. This leaves what is a reasonable value [$9 million] "for the intellect [sic]

     and property, the employees and owners."
     [The City Securities Valuation is dated May 14, 2001, after the purchase price had been agreed upon, and did not opine on any value. (TX 85). IGF ultimately received $16 million, not $19 million. (TX 115). In addition, there is no evidence that the "employees" received the $9 million.]

  (c) "Symons International Group, Inc., which has to deliver the employees (not IGF Insurance Company, which has no employees) is delivering approximately 350 employees with salaries totaling over $13,000,000."
    [As noted above, the employees are employees of IGFH or IGF, not SIG; no evidence was presented to support the assertion regarding number of employees or their purported salaries. Moreover, SIG did not deliver the employees to Acceptance; rather, Acceptance persuaded the employees to work for it and to sign non-compete and retention agreements worth approximately $1.1 million].

  (d) "[Goran] has capital and resources to be in any business . . . . Acceptance wanted and Goran agreed, that for $4,500,000 it would not re-enter the crop business . . . ."
    [As noted above, Acceptance did not seek the agreement with Goran. Moreover, as shown *infra*, Goran was insolvent and was unable to get an SRA from FCIC].

  (e) "The terms for the non-compete were the same or less than those terms agreed with [ADM] and Westfield Insurance Groups."
    [There was no payment associated with any non-compete in the ADM deal and Westfield refused to pay anyone but IGF. (*See infra* Finding of Fact # 145)].

The Symons object to these findings, asserting that Alan Symons' statements to the IDOI were, in fact, truthful. The court declines the Symons' invitation to reweigh the evidence. The court stands by this finding of fact.

  There are two other facts the court wishes to further explain. In Finding of Fact

# 35, the court found that Acceptance paid $40,500,000 for IGF's crop insurance assets. Finding of Fact # 35 was one of many preliminary facts written to give the reader a roadmap of the court's exhaustive findings.  At oral argument, the Symons' attorney stated that this finding was not supported by the cited evidence – the Asset Purchase Agreement, § 2.02 – and was "sort of a manifest error of fact."  (*See* Transcript of Oral Argument dated March 9, 2012, Docket # 386 ("March 9 Transcript"), at 35-36).  The Symons' attorney is "sort of right."  Since this case began, it has been undisputed that Acceptance purchased IGF's crop insurance book of business, and that Acceptance ultimately paid IGF and its affiliates $40,500,000.  (*See*, *e.g.*, Trial Testimony of Alan Symons, Docket # 239 at 516 ("And Acceptance was purchasing the assets of IGF, its crop division, and all of the 40.5 million was paid for those assets, including covenants to protect the assets from being dissipated; is that correct?  Yes.")).  The court should have added that the purchase price included sums paid for non-compete agreements with SIG and Goran and a reinsurance agreement with Granite Re, but that oversight should be forgiven, as the court included a multitude of facts detailing the *entire* agreement in its later findings.  (*See* Findings of Fact ## 48-66).

Second, in Finding of Fact # 274, the court found, "Many of the Symons Family entities have similar corporate names."  At oral argument, the Symons' attorney objected to this fact "because they're simply not similar."  (March 9 Transcript at 36-37).

The court located the organizational chart of the Symons' 17 affiliated entities submitted by CCC in support of its motion for summary judgment.  (Deposition of Alan

Symons, Docket # 36, Ex. 43). This charts reflects: (1) there are three Symons International Group entities: Symons International Group, Ltd., Symons International Group, Inc. – Florida, and Symons International Group, Ltd. – Indiana; (2) two IGF entities: IGF Insurance Company and IGF Holding Company; (3) two Granite Insurance entities: Granite Insurance Company – Canada and Granite Reinsurance Company, Ltd. – Barbados; and (4) five Superior Insurance entities: Superior Insurance Group Management, Inc., Superior Insurance Group, Inc., Superior Insurance Company – Florida, Superior American Insurance Company – Florida, and Superior Guaranty Insurance Company – Florida. (*Id*.). Although some of these entities were not involved in this litigation, this chart is reflective of the interconnected nature of the Symons' corporate entities. Notably, the "Symons Family" is at the top of the chart.

      **B.**    **Objections to the Court's Conclusions of Law**

           **1.**    **Fraudulent Transfer**

The Symons contend the court erred by holding them personally liable for the fraudulent transfer of $24,000,000 that should have gone to IGF and from which they personally benefitted. The Indiana Uniform Fraudulent Transfer Act ("IUFTA") provides that a judgment may be entered against a "first transferee of the asset or the person for whose benefit the transfer was made." Ind. Code § 32-18-2-18(b)(1). The Symons contend, as they did on summary judgment and in their proposed Findings of Fact and Conclusions of Law following the bench trial, that they do not qualify as "transferees" of the purported assets, or persons for whose benefit the transfer was made. In support of

their position, they cite to cases which stand for the unremarkable proposition that there is no accessory or co-conspirator liability for fraudulent transfers under the Uniform Fraudulent Transfer Act. *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, 2004 WL 771230, at *14 (S.D. Ind. March 24, 2004); *Warne Inv., Ltd. v. Higgins*, 195 P.3d 645, 656 (Ariz. Ct. App. 2008); *Arena Dev. Group, LLC v. Naegele Comms., Inc.*, 2007 WL 2506431, at *5 (D.Minn. Aug. 30, 1997); *F.D.I.C. v. White*, 1998 WL 120298, at *2 (N.D. Tex. March 5, 1998). These cases are inapplicable, because the court did not find the Symons personally liable for aiding and abetting a fraudulent transfer or conspiring to do the same. Instead, the court found them liable, as officers and directors of "first transferees," for personally participating in the fraudulent transfer.

As noted by the court previously, the issue of whether an officer or director of a "first transferee" who is found to have personally participated in the fraud can be held personally liable under the IUFTA is an issue of first impression in Indiana. (*See* Conclusion of Law # 85). In determining how this issue should be decided, the court relied on the reasoning employed by the Seventh Circuit Court of Appeals in *DFS Sec. Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 388, 347 (7th Cir. 2004):

> First, Indiana seems to treat claims under the IUFTA as a type of fraud claim. *See, e.g., Fire Police City County Federal Credit Union v. Eagle*, 771 N.E.2d 1188, 1191 (Ind. Ct. App. 2002) (treating a claim under Ind. Code § 32-2-7-15 as a fraud claim); Bruce Markell, *The Indiana Uniform Fraudulent Transfer Act Introduction*, 28 Ind. L.Rev. 1195, 1200 (1995) ("Indiana statutes require a finding that fraud existed in

>           connection with a transaction challenged as a fraudulent
>           transfer."). Second, the IUFTA itself expressly incorporates
>           principles of common law fraud by reference. Ind. Code §
>           32-18-2-20. Finally, at least one other court has applied
>           similar common law to find the president of a corporation
>           personally liable under another state's version of the UFTA,
>           despite the fact that he was not a 'first transferee.' *See Firstar
>           Bank, N.A. v. Faul*, No. 00-C-4061, 2001 WL 1636430, at * 7
>           (N.D. Ill. Dec. 20, 2001).

(*See* Conclusion of Law # 85). Unfortunately, there was never a definitive answer to this question because after the Seventh Circuit certified the issue to the Indiana Supreme Court (it was one of three certified questions), the case settled. At any rate, the court finds the Seventh Circuit's reasoning highly persuasive, and the court sees no reason to reverse itself.

### 2. Piercing the Corporate Veil

The Symons also contend that the court erred by failing to conduct a separate analysis of whether the veil should be pierced as to them (as opposed to the Corporate Counterdefendants). In support of this proposition, they cite *CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276 (Ind. Ct. App. 2012), which stated that "the fraud or injustice alleged by a party seeking to pierce the corporate veil must be caused by, or result from, misuse of the corporate form." *Id*. at 1282-83. This proposition is not new to a piercing analysis; the Indiana Court of Appeals found that a causal connection was implied by the Court's previous rulings. *Id*. at 1282 (citing cases). The evidence in the present case establishes that the injury to CCC was caused by, or resulted from, the Symons' misuse of the corporate form. (*See* Findings of Fact ## 157-300; Conclusions of Law ## 107-128).

The Symons' claim of error for the court's failure to conduct a separate analysis with respect to them individually would have been superfluous, because the same facts and evidence that applied to the Corporate Counterdefendants equally applied to the Symons.

The Symons also argue a number of the facts the court relied upon in piercing the corporate veil are simply not supported by the evidence, or can be easily explained as "common business practices." (Moving Brief at 25). For example, they argue that the Acceptance transaction was an "arms length" deal, (*id*. at 21); the Symons' substantial ownership of the Corporate Counterdefendants and their positions as officers, directors, and majority shareholders of the same is typical in closely held corporations, (*id*. at 24); the Corporate Counterdefendants were not undercapitalized during the relevant time period (*id*. at 25); and the Symons' compensation was not excessive or used as a subterfuge to drain the Corporate Counterdefendants of assets, (*id*. at 27). At this late stage of the proceedings, the court is not inclined to revisit the facts or reweigh the evidence, as the court is satisfied that the facts support its conclusions. (*See* Findings of Fact ## 157-315; Conclusions of Law ## 102-128).

    **C.**    **Conclusion**

For the reasons set forth above, the court **GRANTS** in part and **DENIES** in part Alan and Gordon Symons' Motion to Amend Findings and Conclusions (Docket # 357). Specifically, the court **GRANTS** the motion to the extent the Symons asks the court to amend Finding of Fact # 53, and **DENIES** the motion in all other respects. Finding of Fact # 53 is hereby amended as follows:

53. The original proposal from Acceptance's Chairman, Michael McCarthy ("McCarthy"), included "$6.0 million in non-compete payments paid over three years" to "three senior managers and 15 others to be selected by [Acceptance]." (TX 29). None of the non-compete payments to Goran and SIG, nor reinsurance payments to Granite Re, were contained in that original proposal. (*Id.*; *see also* McCarthy Dep. at 38-44; Trial Testimony of Alan Symons, Docket # 239 at 528-29 (testifying that McCarthy's original proposal did not include non-compete agreements with SIG and Goran and reinsurance from Granite Re)). The idea for non-compete agreements with SIG and Goran, and a reinsurance agreement with Granite Re, came from Alan Symons. (TX 31; *see also* McCarthy Dep. at 52).

**SO ORDERED** this <u>14th</u> day of November 2012.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.